PEOPLE OF PORTO RICO, Plaintiff and Appellee, *v.* LUIS SANDALIO MUNERA, Defendant and Appellant.

No. 3366. Argued April 17, 1928.—Decided March 12, 1929.

*Felipe Colón Díaz* for the appellant. *José E. Figueras* for the appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the court.

Luis Sandalio Munera was sentenced to six years in the penitentiary on conviction of the crime of rape. He appealed from the judgment and has assigned ten errors.

It is contended in the first assignment that the court erred in directing the clerk to administer the final oath to each juror individually instead of to the twelve together.

The record shows that the jurors were called to try the case and after being sworn on *voir dire* they were examined as to their qualifications to serve as jurors. Some challenges for cause were made and finally a group of twelve was selected as qualified to serve.

Then the court asked the district attorney if he had any peremptory challenges to make. The district attorney made one and the following incident occurred:

"Judge.—Has the defendant any peremptory challenges to make? The Court informs both the prosecution and the defense that in this trial it is going to use its discretion and asks both the district attorney and the attorney for the defendant to make their peremptory challenges to the Jury because the final oath will be administered after the peremptory challenges are made now. Attorney.—Can peremptory challenges be made at any time? Judge.—No. If the district attorney has any challenge to make, let him make it

now. If you have any, make it now, because the Court is going to administer the final oath to the jurors left. Attorney.—Will not the Court allow that later? Judge.—No. Attorney.—Julio Pérez. Judge.—Julio Pérez is excused. Is the prosecution or the defense going to challenge any other jurors? District Attorney.—No. I accept the gentleman. Attorney.—I have not finished yet. Enrique Armstrong. Judge.—Mr. Armstrong is excused. Attorney.—Is your name Jaime Rullán? (A) Yes. (Q) How old did you say your daughters are? (A) Fourteen and eighteen years. Attorney.—Mr. Rullán. Judge.—Mr. Rullán is excused. Attorney.—What is your name? (A) Julio Emmanuelli. (Q) Did you tell me that you had daughters? (A) Of eight years. Judge.—The jurors will please stand up and be sworn to try this case. (Five of the jurors, who had not been challenged by the parties, were sworn by the clerk.) Attorney.—Your Honor, we ask the court for leave to take an exception to the ruling of the court. The jury is not made up of twelve men and five jurors have been sworn; that is why we take exception.''

The names of seven jurors were then drawn to complete the panel. They were examined by the attorney for the defense. Both the prosecution and the defense made peremptory challenges. On being asked by the court whether they had any more challenges they replied in the negative and the following occurred:

''Judge.—A similar ruling is made by the court because it understands that there is sufficient reason for adopting that rule by virtue of the decision of the Supreme Court of Porto Rico in People v. Vázquez, 20 P.R.R. 338, and the clerk will administer the final oath to the four jurors. Attorney.—We take the same exception. Judge. —If you desire to show that there is an abuse of discretion the Court is ready to hear you, because in that case the Court would be pleased to hear you on that point so as to be able to rectify if it were proper and would order these jurors to retire. Attorney.—I have doubts about whether a part of the jury can be sworn. Judge.—That is why the court has cited the case of People v. Vázquez, 20 P.R.R. 338. If you believe that you can convince the court, it will order that these jurors retire and will be glad to hear counsel and rectify its opinion, if proper. Attorney.—I only have doubts.''

The four remaining jurors were sworn by the clerk and

the names of three more were drawn. They were examined, one was challenged for cause and the following occurred:

"Judge.—Peremptory challenges? Attorney. — None. Judge. — Let the two remaining jurors be sworn. Attorney.—We except."

The name of one more juror was drawn and the following occurred:

"Judge.—Peremptorily? District Attorney.—I accept the gentleman. Attorney.—I accept the juror. Judge.—The last juror will please stand up and be finally sworn to try the present case.

"(The court takes a recess.) Judge.—Call the court to order, marshal. Let the jurors come in and take their seats. (The jury return to the court room.) Judge.—The clerk will read the information. Attorney.—We desire to take an exception because the jury is composed of jurors who have been sworn individually instead of as a panel.

In the case of *People* v. *Vázquez*, 20 P.R.R. 338, cited by the trial court, this court said:

"The appellant also alleges that the court erred in not compelling the *fiscal* to make his challenges as each juror appeared. It appears that the *fiscal* reserved his peremptory challenges and the court permitted him to do so, granting a similar privilege to the defense.

"Section 221 of the Code of Criminal Procedure provides that the challenge must be made when the juror appears and before he is sworn to try the case, and also that the court may for cause permit it to be made after the juror is sworn and before the jury is completed.

"Every juror is required to take two oaths: (1) the *voir dire* as to his qualifications and (2) to try the particular case before the court. Undoubtedly section 221 of the Code of Criminal Procedure refers to the second oath.

"Apparently the procedure adopted by the *fiscal* in this case was not strictly in accordance with the provisions of the statute, but it is not shown to be in direct opposition thereto, because, although it is stated that the *fiscal* reserved his peremptory challenges, it is not shown that they were made after the jury had been sworn to try the case.

"Besides, as we have seen, the same statute authorizes the court to vary the order prescribed, and as jurisprudence has established that

courts may decide such questions in the exercise of a sound discretion (*People* v. *Montgomery,* 53 Cal., 576; *Peole* v. *Rodríguez,* 10 Cal., 50; *People* v. *Durrant,* 118 Cal., 179, 197), it would have to be shown that the court abused its discretional power in order that the error which may perhaps have been committed could serve as a ground for the reversal of the judgment.

"And, finally, as the *fiscal* of this court aptly says in his brief:

" 'The record does not show that any juror was peremptorily challenged by the *fiscal* after the court had ruled upon the motion of the defense and pointed out the rule to be observed by the *fiscal* in making peremptory challenges, and as the record does not show this, even in case the court committed error, it would have been immaterial because no substantial right of the appellant was prejudiced.' "

From the facts of this case in the light of the law and the jurisprudence established in the opinion cited it can not be held that any error was committed by the district court.

Recently in *People* v. *Rivera,* 37 P.R.R. 706, this court liberally construed section 221 of the Code of Criminal Procedure as follows:

"It is evident that the law does not mean to restrict greatly the right to challenge which is related to the right of the defendant to a fair and impartial trial. Therefore the phrase 'when the juror appears' can not be construed in the sense that the challenge must be made in the very act of his appearing, the more so in the case of a peremptory challenge which must be preceded by the challenge for cause.

"The limitations set forth by the statute cited refer to making the challenge before swearing the jurors who will try the case and before the jury is completed."

Notwithstanding that liberal construction, we believe that the conclusion heretofore reached should stand. In the Rivera Case, *supra,* the district court imposed a rule contrary to the elasticity established by the statute itself in order to allow the challenge even after taking the oath and held that rule to be inflexible when the defendant, who had not exhausted his challenges, attempted to exercise his right by making one. We understand the attitude of the court in this

case to have been open to any suggestion, and the defendant did not attempt to make any peremptory challenge that was refused by the court and has not alleged prejudice, but accepted the jury and only raised the question as one of law.

The simplest procedure and that which better adjusts itself to the liberal construction of section 221 to be found in *People v. Rivera, supra,* is to draw the names of a sufficient number of jurors and administer to them the first oath. Immediately follows their examination and challenges for cause. Then the peremptory challenges. If there are no challenges they are all sworn to try the case. If there are any, without swearing those left to try the case new names are drawn and the same procedure is followed. When the parties finally accept the jury or there are no more challenges for cause and the peremptory challenges allowed are exhausted, then the jurors as a panel are sworn to try the case.

The second assignment is that "The trial court committed error in not allowing the cross-questions to witness Cristeria Rosario and in suggesting to her the manner in which she should testify."

In support of the assignment the appellant transcribes in his brief the following incidents:

"Q.—And how long were they there? Judge.—Answer, if you can. D. Attorney.—That question has been asked her ten times. Judge.—I know the moral torture to which a witness may be subjected. You may object if you feel inclined. Answer simply and exclusively what you know. If you can not specify the hour and minute, you may answer: 'A short time,' 'A good while,' because you are not bound to be more explicit. Attorney.—I except to the instructions given by the judge to the witness.

"Q.—Are there any homes on this side of the bridge? A.—I can not say because I very rarely go there. Q.—Have you not seen that locality? A.—I have seen houses but I do not know whether families live in them. Q.—Are there any houses? A.—There are. Q.—Are there any shops? A.—I can not tell because I do not know that. Q.—How many houses are there on this side of the bridge? A.—I have not counted them. Q.—More or less. A.—I can not say. Q.—More or less. Are there more than three? A.—I

can not say. Judge.—She has already answered that she can not say. Attorney.—Let us see whether she can say. Judge.—You are subjecting the witness to a great moral torture. Attorney.—We are cross-examining. We might be more suggestive. Judge.—The court has been observing how the witness is being examined. The court is going to order a recess to allow her to recover from the moral torture to which she has been subjected. It is my duty at this moment to remind the jurors that they should not talk among themselves or allow anybody to approach them and talk to them about this case for the present. Quiet yourself, calm yourself, and then you will answer the questions of the defense. Attorney.—Exception taken., The witness is answering the questions well and is quiet. Judge.—The court has been observing the witness and so states. Attorney.—I except to the attitude of the court.''

The appellant invokes in his defense the opinion of this court in *People* v. *Aponte,* 26 P.R.R. 537, as follows:

''We agree with the district attorney that the court's power to prevent a repetition of the same questions is well settled. The judge may see to it (38 Cyc. 1315) that the examination of witnesses is conducted in an orderly manner, and a large discretion is given to him in controlling such examination. 'Thorough and sifting cross-examinations should be allowed,' said the Supreme Court of Georgia in the case of *Alabama Const. Co.* v. *Continental Car Co.,* 62 S. E. 160, 162, 'but this does not mean that counsel have an unrestricted right to repeat questions to a witness. The judge may restrain useless and unnecessary repetition.'

''We have, however, carefully examined the testimony of the witness referred to and have arrived at the conclusion that the question put by the defendant's counsel upon cross-examination had not really been propounded or answered previously. Therefore, this being so, it is obvious that the district court exceeded its powers and denied the defendant a fundamental right guaranteed him by subdivision 4 of section 11 of the Code of Criminal Procedure.'' .

In order to explain the conduct of the district judge in this particular it would be necessary to transcribe all of the cross-questions from which the necessity for his interference arose. Even from a cool reading of the record it may be seen that the attorney for the defendant exceeded his prerogatives. The judgment was reversed in the *Aponte Case,*

*supra,* because the cross-questions intended to be asked by the attorney and not allowed by the court had not really been asked or answered previously. Such is not the case here. The testimony of the complainant fills 57 pages of the transcript and refers to facts which could have been related in detail on eight or ten pages. The first incident complained of by the appellant appears on page 29 of the testimony and the second on page 32.

It seems well to transcribe sections 151 and 165 of the Law of Evidence, as follows:

"Sec. 151. The court must exercise a reasonable control over the mode of interrogation, so as to make it as rapid, as distinct, as little annoying to the witness, and as effective for the extraction of the truth as may be; but subject to this rule, the parties may put such pertinent and legal questions as they see fit. The court, however, may stop the production of further evidence upon any particular point when the evidence upon it is already so full as to preclude reasonable doubt.

"Sec. 165. It is the right of a witness to be protected from irrelevant, improper, or insulting questions, and from harsh or insulting demeanor; to be detained only so long as the interests of justice require it; to be examined only as to matters legal and pertinent to the issue."

The court should be very careful in complying with these duties and make use of its power only in real necessary cases. Otherwise, a judgment entirely just might have to be reversed because of an unnecessary action.

The third assignment is that the court should not have admitted in evidence certain pieces of clothing.

The clothing was recognized by the complainant as belonging to her and as that which she was wearing and was torn by the accused when the act was committed. She testified also that the act was committed at dawn of a Sunday and the garments in question were delivered by her to the police on the following Monday.

Under these circumstances we do not believe that any error was committed in admitting the evidence.

Likewise, the fourth assignment is without merit. The complainant testified at the trial that after the commission of the act the accused and Domingo Torres disappeared ''and at about three o'clock in the morning, I, with the help of God, went to the house of Juana Echavarría (from which she had been taken shortly before by the accused and Torres by the use of deception and violence) and told her what had happened.'' The court admitted the testimony of Juana Echavarría and the appellant assigns that as error. The testimony was admissible as a part of the *res gestae*. *People* v. *Arenas Alemañy, ante* page 14; *People* v. *Calventy,* 34 P.R. R. 375.

The fifth assignment is that ''The trial court likewise erred in admitting the hearsay testimony of witness Jaime González, district chief of police, and allowing him to testify about the nature of some scratches.''

In considering this assignment, which indeed is the one that has caused us to hesitate in the decision of this case, it seems necessary to transcribe in full the testimony attacked. It is as follows:

''TESTIMONY OF JAIME GONZÁLEZ. D. Attorney.—What is your name?—Jaime González. What is your profession?—I am district chief of police. What is your district?—Juana Díaz. How long have you been district chief of police in Juana Díaz?—Five years. About the first or the second, on the second, were you informed of an act which took place in Juana Díaz wherein this defendant was involved?—Yes. Did you see Cristeria Rosario?—Yes. Did you see her?—Yes. Before or after this event?—Afterwards. When was it that you saw her?—I think it was on the second; between the second and the third. Well, which day of the week?; can you tell?—Maybe between Monday and Tuesday. Who accompanied her to town?— She was accompanied by a woman by the name of Juana Echavarría. Did she come of her own free will, or was she sent for by somebody? She came herself. Judge.—Where to?—To the police station.—D. Attorney.—Did you see that girl?—I did. Did you notice anything on her? Yes. Attorney.—I move that that answer be stricken out. If the jurors have heard it they should dismiss it from their minds. Judge.—The court has not heard anything said by the witness. If it

had heard anything it would have to say: 'Too late, he has already answered.' Attorney.—We are going to object because he states that it was two or three days afterwards that he saw that girl and that she testified before him. D. Attorney.—It is not what she testified, but what he saw. Attorney.—What he saw? We object because it is not a part of the *res gestae*. If an alleged complainant in a case of rape immediately after the commission of the act goes to a person and such person sees anything on the complainant that would be admissible; but if that observation takes place two or three days after, no matter how the complainant might appear, no matter the traces on her, no testimony thereon is admissible because it is too late and it no longer forms a part of the *res gestae*. D. Attorney.—Your Honor, I think it is perfectly admissible. If the chief of police saw that girl and found any trace, he may say that he saw such and such a thing; in other words, he corroborates the testimony of the complainant when she states that she had traces on her neck. Judge. —The court admits the testimony of the chief of police on those particulars. Attorney.—We take exception, based on the testimony of the witness who states that it was two or three days after the commission of the act that he saw that girl and on the decision in People v. Maldonado, 17 P.R.R. 22. Judge.—The court admits the question of the testimony for the witness on those particulars. D. Attorney.—State to the jurors what you noticed, if anything, on this girl. Attorney.—We object, and in order to avoid inconvenience to the witness and to the court let it be understood that we take exception on the same grounds to the whole testimony of the chief of police González. Witness.—I noticed that she had something like scratches here on the right side of her neck. D. Attorney.—That is all. Attorney.—That is all. Judge.—Tell me something. You say that you saw that woman by the name of Cristeria Rosario? Yes, Sir. That you saw her between the second and the third of January? —Yes, Sir. That is, between Monday and Tuesday? Yes, Sir. And that you noticed that there was something the matter with that woman.—What was the matter with that woman? She had something like scratches on this side. Were they scratches or something resembling scratches?—Some scratches. Can you state positively that they were scratches? Yes, it seems that she had struggled with somebody. Attorney.—We beg the court to instruct the jury that the statement 'It seems that she had struggled with somebody' should be disregarded by them. Judge.—Yes. The jurors should disregard that. One thing is to state positively and another is 'It seems to me.' What was it you noticed on that woman?—Some sort

of scratches. How were those scratches?—On the right side of the neck. What was the condition of those scratches? Were they bleeding?—No, Sir; they were already dry. From the dry condition of those scratches, could you tell the court whether they had been inflicted recently or some time back? What can you tell the court in that respect? Attorney.—Please, Your Honor. The witness can not testify as to that because he is not a medical expert. Judge.—He is an observer. He has stated that he saw scratches. The court thinks that he can tell the court and the jury about the condition of those scratches, whether they were recent. Attorney.— We respectfully object to the question from Your Honor. Judge.— The witness may answer. Attorney.—We take exception. Judge.— Why do you say that they were recent?—Because the blood was clotted about here. Clotted blood?—Yes, as if one is held tight. But when one is held tight what is left is the mark of the pressure, a purple mark, while a scratch is like a wound, an almost incised wound. What was it that woman had, wounds caused by scratching or the mark of pressure? Attorney.—With all due respect, we desire to object. Your Honor is examining, but we can not but object because Your Honor is putting leading questions to the witness who is an intelligent witness, a district chief of police, and he is a witness for the government. Judge.—You may answer. Attorney.—We take exception. Witness.—Yes. She had the blood clotted and some scratches besides; she had both things on the right side of her throat. Judge.—The prosecution may proceed with the examination of the witness if so desired. D. Attorney.—That is all. Judge.—Did you take the accused into custody? Yes, Sir, he was taken into custody. Judge.—When you took the accused into custody, did he make any statement in connection with the act? Attorney.—He says: 'He was taken into custody.' Judge.—Was it not the question: 'Did you take the accused into custody?' Attorney.—Yes, Sir, and his answer was: 'He was taken into custody.' Judge.—When this accused was taken into custody, was he taken before you?—Yes, Sir. I talked with him. In your talk with him, with this accused, did you ask him any question, or did he make any statement in connection with the facts under investigation now?—No, Sir. D. Attorney.—The case for the government is closed. Judge.—The court has been putting all these questions because in its opinion it is the duty of the court to protect not only any witness but also the rights of the accused.''

In order to maintain that it is a case of hearsay evidence

the decision of this court in *People* v. *Maldonado,* 17 P.R.R. 22, is cited.

In our opinion the case cited is not applicable. It is not a case of hearsay evidence. González did not testify in regard to statements made to him, but in regard to something which he himself saw.

In regard to the second point of the assignment the appellant only makes in his brief the following citation:

"In 33 Cyc. 1471, the following is said:

" 'Physicians may testify to the physical condition of prosecutrix upon examination made after the crime was committed, but the remoteness of such examination from the time of the offense affects its probative force. When the examination is made at a distant time and acts of intercourse with others may have taken place, it is too remote and such evidence is not admissible.' "

That quotation is not entirely applicable. A scratch is something that may be noticed by anybody. The witness was a policeman and therefore an experienced person.

What is really noticeable is the conduct of the judge. What need was there of his intervention? There is no doubt that the judges may intervene in clearing up the facts. Many times a single question which goes to the bottom of the matter unravels and brings out the truth; but generally they should not interfere. Here the judge clearly exceeded his powers and jeopardized all of his work. He seems to have been animated solely by the spirit of justice, but judges should try to impart justice with the greatest possible equanimity permitted by our imperfect human nature. However, we do not believe that the transgression necessarily carries with it a reversal of the judgment in view of all of the other circumstances of the case.

The sixth assignment is not important and the seventh and eighth assignments were abandoned by the appellant in his brief.

The ninth assignment is a general discussion of the con-

duct of the trial judge as prejudicial to the accused, and it is contended in the tenth that the evidence is insufficient.

We have made two references to the conduct of the judge and in one of them we stated our hesitation in regard to the decision to be adopted. After a careful study we do not think that his conduct had any influence on the verdict of the jury. The instructions of the judge were very broad and just to both parties.

In our opinion the evidence was clear. Let us hear the victim, Cristeria Rosario.

She was not a virgin. She had been deflowered some time before by another man and lately had consented to go and live in concubinage with Ramón Rodríguez. He took her to the house of Juana Echavarría who was living near the town of Juana Díaz and left her there on New Year's eve (December 31, 1926) to return for her on the following day. Cristeria and Juana went to bed and then occurred what we shall undertake to relate in the exact words used by the witness:

"Well, what happened was that after we were in bed about nine or ten at night somebody came and knocked at the door and inquired whether Ramón Rodríguez was there . . . . He knocked and asked Juana to tell him whether Ramón Rodríguez was there and she answered that Ramón Rodríguez was not there . . . . He then went away; but between ten and eleven some people came and knocked in the name of the police from Juana Díaz. On Juana's inquiring what business had the police there they told her they came on account of a girl kept by Ramón Rodríguez there in connection with some disturbances caused by Ramón; and then she replied that she could not open the door and they told her then that they had a warrant from the judge of Juana Díaz . . . .; that with the police such requisite was unnecessary. She answered that she could not open the door at that hour and if there was anything the matter she would go in the morning to the police station and otherwise that they should go and get Ramón Rodríguez in his home. They told her to open or they would use force. She then got up and opened the door and on doing so they asked for me to appear . . . . She asked me to give her the lamp, which I did, and she recognized them. She got frightened when she found out that they were not policemen.

They then grabbed me and took me away, telling me that they were keeping Ramón Rodríguez in custody at the bridge, in a car . . . . This man, pointing to the accused, was one of them. On finding out that Ramón Rodríguez was not there in custody at the bridge, as stated by them, I told them that they were not policemen and asked the reason for their taking me out of the house of Juana Echevarría, and I started to run away but they jumped and grabbed me. I then fought to go but was helpless. They held me tight and took me then into a cane field and then to a clearing further down . . . . They then had carnal intercourse with me; then they disappeared, and I, with the help of God, reached the house of Juana Echevarría about three o'clock in the morning and told her what had happened to me . . . ."

She recognized the accused as one of the two men who had had carnal intercourse with her in the manner described. She continued by fully explaining the violence of the act and how they tore the clothes she had on and how she had informed the police about the occurrence accompanied by Juana Echavarría.

Having been submitted to a long and at times abusive examination, she always sustained what she had said. The defense attacked her veracity by producing her former testimony at the trial of Torres. Certain contradictions are noticed about how Torres behaved at times, but not as to Munera.

Juana Echavarría corroborated in every particular the testimony of the complainant. She testified in part as follows:

"It happened that they made me get up by calling: 'Mistress of the house, mistress of the house,' to which I replied: 'What is the matter, what do you want of me?' They then said: 'The police.' I said: 'What does the police want?' They then said: 'A warrant of arrest from the judge and the chief and that by reason of that woman kept by Ramón Rodríguez here, there has been a lot of disturbance in Guayabal and we come with a warrant of arrest from the chief and the judge.' They told me to get up in order to make an investigation. I told them to wait until the next day but they refused because they had a warrant from the judge and the chief,

that I should get up quickly to avoid trouble . ... I got up and opened the door. They asked for Cristeria and 1 called her . . . She came and begged them as a favor not to take her, that she would go in the morning, but they refused because they had to take her to town anyhow . . . She then begged them to go and bring Ramón and they again would tell her the same thing. I told her: 'Cristeria, give me that lamp to see who they are, and then I recognized them. They were this man (pointing to the accused) and Domingo Torres. When I told Cristeria to give me the lamp they got frightened and grabbed her and took her away . . . The girl returned that same night about three o'clock in the morning . . . She called me and I got up and she then told me what had happened to her.''

It is not necessary to examine the rest of the evidence. The testimony of those two witnesses is sufficient, as it was believed by the jury, to sustain the verdict of guilty rendered by them.

The judgment appealed from must be affirmed.